UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

J. & W. SELIGMAN & CO. INCORPORATED,    :
et ano,

                                        :

                Plaintiffs,

                                          :                05 CV 7781 (KMW)

            v.

                                          :

ELIOT SPITZER, ATTORNEY GENERAL
OF THE STATE OF NEW YORK,            :

                Defendant.         :

-----------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

                            ELIOT SPITZER
                            Attorney General of the
                             State of New York
                            <u>Attorney for Defendant</u>
                            120 Broadway, 24th Floor
                            New York, New York 10271
                            (212) 416-8635

JAMES B. HENLY
LOUIS WILLENKEN
Assistant Attorneys General
  of Counsel

## **TABLE OF CONTENTS**

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Legal and Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.       The Martin Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
B.       Securities Fraud Investigations Under the Martin Act . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT I        -         ABSTENTION IS APPROPRIATE UNDER
                         YOUNGER v. HARRIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A.       Younger v. Harris Requires Federal Courts to Refrain from Interfering with
         Ongoing State Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B.       Because the Younger Doctrine Applies to the State Attorney General's Ongoing
         Martin Act Proceeding, this Court Should Refrain from Exercising Jurisdiction . . . . . . . 9

         1. The State is Conducting an Ongoing Proceeding Concerning Seligman
            and Zino . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         2. The Attorney General's Martin Act Fraud Investigations, and Similar Securities
            Investigations by other States, Further Important State Interests . . . . . . . . . . . . . . . 17

         3. New York's Laws Provide A Ready Vehicle for Plaintiffs to Challenge
            the Subpoenas or the Attorney General's Investigation in State Court . . . . . . . . . . . 19

POINT II       -         THE STATE ATTORNEY GENERAL IS NOT PREEMPTED
                         FROM INVESTIGATING FRAUD IN CONNECTION WITH
                         ADVISORY FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.       The ICA Does Not Expressly Preempt State Fraud Enforcement Nor Has Congress
         Revealed a Purpose to Occupy the Field of Securities Regulation . . . . . . . . . . . . . . . . 21

B.       There Is No Conflict Between a State Fraud Investigation and the ICA . . . . . . . . . . . . . 24

C.       Courts Considering the Issue Have Rejected ICA Preemption
         of State-Law Fraud Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

**Cases** **Page**

Baker, Watts & Co. v. Miles & Stockbridge,
 876 F.2d 1101 (4th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Bates v. Dow Agrosciences LLC.,
 ___ U.S. ___, 125 S. Ct. 1788 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28

Burks v. Lasker,
 441 U.S. 471 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.P.C. International, Inc. v. McKesson Corp.,
 70 N.Y.2d 268 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CSX Transport, Inc. v. Easterwood,
 507 U.S. 658 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CTS Corp. v. Dynamics, Corp.,
 481 U.S. 69 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Chicago & Northwestern Transport Co. v. Kalo Brick & Tile Co. ,
 450 U.S. 311 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Christ the King Regional High School v. Culvert,
 815 F.2d 219 (2d Cir.), cert. denied, 484 U.S. 830 (1987) . . . . . . . . . . . . . . . . . . . . . 8, 9

Diamond "D" Construction Corp v. McGowan,
 282 F.3d 191 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 20

Dunham v. Ottinger,
 127 Misc. 683 (Sup. Ct. Albany Co. 1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Edgar v. MITE Corp.,
 457 U.S. 624 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Florida Lime & Avocado Growers, Inc. v. Paul,
 373 U.S. 132 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for S. Cal.,
 463 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Cases**                                                                                                    **Page**

Gardner v. Lefkowitz,
   97 Misc. 2d 806 (Sup. Ct. N.Y. Co. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Green v. Fund Asset Management,
   245 F.3d 214 (3d Cir. 2001), cert. denied 537 U.S. 884 (2002)  . . . . . 2, 22, 23, 28,29, 30

Hansel v. Town Court,
   56 F.3d 391 (2d Cir.), cert. denied 516 U.S. 1012 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hicks v. Miranda,
   422 U.S. 332 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Hip-Hop Summit Action Network v. N.Y. Temporary State Commission on Lobbying,
   2003 U.S. Dist. LEXIS 21229 (S.D.N.Y. Nov. 25, 2003) . . . . . . . . . . . . . . 15, 16, 17, 20

Huffman v. Pursue, Ltd.,
   420 U.S. 592 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 17, 19

IDS Bond Inc. v. Gleacher Natwest, Inc.,
   2002 U.S. Dist. LEXIS 4073 * 20, WL 373455, Fed Sec. L. Rep. P. 91750
   (D.Minn. March 6, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Jones v. Rath Packing Co.,
   430 U.S. 519 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Juidice v. Vail,
   430 U.S. 327 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 14, 17, 19

Kaylor v. Fields,
   661 F.2d 1177 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Kingston v. Utah County,
   1998 U.S. App. LEXIS 22005 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Law Firm of Daniel P. Foster, P.C. v. Dearie,
   613 F. Supp. 278 (E.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Medtronic, Inc. v. Lohr,
   518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

Metropolitan Life Insurance Co. v. Taylor,
   481 U.S. 58 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Middlesex Co. Ethics Committee v. Garden State Bar Association,
   457 U.S. 423 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

**Cases**                                                                    **Page**

Morales v. Trans World Airlines, Inc.,
    504 U.S. 374, 119 L. Ed. 2d 157, 112 S. Ct. 2031 (1992) . . . . . . . . . . . . . . . . . . . . . 13, 22

N.Y. State NOW v. Pataki,
    261 F.3d 156 (2d Cir. 2001), cert. denied 534 U.S. 1128 (2002) . . . . . . . . . . . . . . . . . 20

New Orleans Public Service, Inc. v. Council of the City of New Orleans,
    491 U.S. 350 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

New York State Department of Social Services v. Dublino,
    413 U.S. 405 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Nick v. Abrams,
    717 F. Supp. 1053 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

O'Shea v. Littleton,
    414 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.,
    477 U.S. 619 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Orson, Inc. v. Miramax Film Corp.,
    189 F.3d 377 (3d Cir.1999), cert. denied 529 U.S. 1012 (2000) . . . . . . . . . . . . . . . . . . 24

People v. Federated Radio Corp.,
    244 N.Y. 33 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

People v. Kaufman & Broad Homes, Inc.,
    89 Misc. 2d 769 (N.Y. App. Term Second Dept. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

People v. Rice,
    221 A.D. 443 (First Dept. 1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

People v. Stern,
    86 Misc. 2d 101 (Sup. Ct. N.Y. Co. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Rice v. Santa Fe Elevator Corp.,
    331 U.S. 218 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Spargo v. New York State Commission on Judicial Conduct,
    351 F.3d 65 (2d Cir. 2003), cert. denied, 541 U.S. 1085 (2004) . . . . . . . . 8, 15, 17, 20, 21

Stone & Webster Engineering Corp. v. Isley,
    690 F.2d 323 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Cases**                                                                                          **Page**

Temple of the Lost Sheep, Inc. v. Abrams,
   930 F.2d 178 (2d Cir.), cert. denied 502 U.S. 866 (1991) .......................... 9

Trainor v. Hernandez,
   431 U.S. 434 (1977) ...................................................... 19

University Club v. City of New York,
   842 F.2d 37 (2d Cir. 1988) .................................................. 8

Younger v. Harris,
   401 U.S. 37 (1971) ................................................... passim

Zuri-Invest AG v. Natwest Finance Inc.,
   177 F. Supp. 2d 189 (S.D.N.Y. 2001) .................................. 23, 30, 31

## UNITED STATES CONSTITUTION

U.S. CONST. Art. VI, cl. 2 ..................................................... 21

## FEDERAL STATUTES

Federal Rules of Civil Procedure
Rule 12(b)(1) ................................................................ 1

15 U.S.C. § 77p ............................................................. 23
      § 77p(a) .............................................................. 23
      § 77r(c)1 ............................................................. 26
      § 78bb(a) ............................................................ 23
      § 78bb(f) ............................................................ 23
      § 80a-35(b) .............................................. 2, 21, 29, 30, 31
      § 80b-3a(b)(2) ........................................................ 26

S. Rep. No. 91-184 (1970), reprinted in 1970 U.S.Code Cong. & Ad. News
   4897, 4898 ............................................................. 30

Securities Litigation Uniform Standards Act of 1998 ("SLUSA"),
   P.L. 105-353, 112 Stat. 3227 (1998) ...................................... 23

**FEDERAL STATUTES** **Page**

28 U.S.C. § 1257(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

104 P.L. 290 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**NEW YORK STATUTES**

Executive Law § 63(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

McKinney's Gen. Bus. Law.
   § 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12
   § 352(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   §§ 352-399-m (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   § 354 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 19

N.Y. Civ. Prac. Law § 2304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   § 2308(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   § 5015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   § 5223 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   § 5224 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

N.Y. Legis. Law § 1-d(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

**MISCELLANEOUS**

Remarks of Repr. Edward J. Markey, Ranking Demo. Member, Subcommittee on
   Telecommunications and Finance Markup of H.R. 3005 . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conference Report, H.R. Conf. Rep. 104-864, 104th Cong., 2d Sess., at 40 (1996), reprinted
   in 1996 U.S.Cong. & Ad. News 3920, 3921 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Di Trolio, Sefania A., *Public Choice Theory, Federalism, and the Sunny Side to Blue Sky*
   *Laws,* 30 Wm. Mitchell L. Rev. 1279, 1291-92 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Jonathan R. Macy, *The SEC at 70: Positive Political Theory and Federal Usurpation of the*
   *Regulation of Corporate Governance: the Coming Preemption of the Martin Act*, 80 Notre
   Dame L. Rev. 951, 958 (March, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 24

Uniform Securities Act, National Conference of Commissioners On Uniform State Laws
   (last revised in 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
J. & W. SELIGMAN & CO. INCORPORATED,        :
et ano,
                                             :

               Plaintiffs,
                                             :        05 CV 7781 (KMW)

          v.
                                             :

ELIOT SPITZER, ATTORNEY GENERAL
OF THE STATE OF NEW YORK,                    :

               Defendant.       :
-------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

### Preliminary Statement

        Plaintiffs J. & W. Seligman & Co. Incorporated ("Seligman") and Brian T. Zino

("Zino") bring this action in an effort to interfere with an ongoing state investigation being

conducted by the Office of the Attorney General of the State of New York, Eliot Spitzer (the

"Attorney General") , which concerns, among other things, whether Seligman, the investment

adviser to the Seligman family of mutual funds, or others, have committed fraud in respect to

advisory fees and expenses received by Seligman from the Seligman Funds.  Pursuant to Rule

12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure, the Attorney General urges the court

to dismiss plaintiffs' complaint (a) under the Younger abstention/comity doctrine, in view of the

State's ongoing proceeding examining possible fraud by plaintiffs and others relating to advisory

fees and expenses paid by the Seligman Funds; or, should the Court determine not to abstain,

then (b) for failure to state a claim upon which relief can be granted, because the federal

preemption claim that plaintiffs press is wholly lacking in basis.

In brief, plaintiffs complain that the Attorney General has issued subpoenas to Zino, the president and chief executive officer of Seligman, and to others, that, among other things, seek documents "directed to advisory fee negotiations" between Seligman and the independent directors of the Seligman Funds. Complaint, ¶14. Seeking to prevent the Attorney General from uncovering facts relating to possible fraud in connection with such fees, plaintiffs assert that *any* inquiry by the State Attorney General touching upon the subject of its advisory fees is preempted by federal law, specifically the Investment Company Act of 1940 ("ICA"). Id., ¶¶ 11, 15. Plaintiffs seek an injunction from this Court quashing the subpoenas insofar as they seek information about Seligman's "'excessive' advisory fees" and further ordering the State Attorney General to stop investigating that subject. Id. at Wherefore Clause (A).

As shown below, at Point II, plaintiffs' suit is without merit. The ICA, as amended in 1996, expressly preserved the longstanding authority of the States to investigate and prosecute frauds relating to investment advisers. And the precise preemption claim advanced by plaintiffs, based on §36(b) of the ICA, has been unequivocally rejected. Green v. Fund Asset Management, 245 F.3d 214, 223 n.6 (3d Cir. 2001), cert. denied 537 U.S. 884 (2002). Nevertheless, this Court should refrain, at this juncture, from joining the Third Circuit in reaching that ineluctable conclusion, because, as shown in Point I, under Younger v. Harris, abstention is warranted in deference to the State's ongoing enforcement proceeding.

## Statement of Facts

On January 30, 2004, the State Attorney General commenced a Martin Act investigation of possible fraudulent conduct by Seligman and related entities and persons, believed to be affecting the performance of the Seligman family of mutual funds. Declaration of

2

R. Verle Johnson, ¶ 4;[1] cf. Complaint, ¶ 9. That investigation is still ongoing (see Complaint ¶

10, noting the investigation has "continued for well over a year"), and, quite recently, has

resulted in a judicial order being entered by the New York State Supreme Court, County of New

York, pursuant to the Martin Act (more specifically, State General Business Law § 354),

directing plaintiffs and others to provide certain discovery. Johnson Decl. ¶ 10.

　　　　　　　　The events that bring plaintiffs to this Court, according to their complaint, begin

in August, 2005. In late August 2005, the State Attorney General's Office issued subpoenas

under the Martin Act to the President of Seligman and others, seeking a range of information,

including on both the subjects of frequent trading and advisory fees. Complaint, ¶ 14.[2] A portion

of the subpoena served upon plaintiff Zino is annexed to the Complaint as Exhibit A.

Subpoenas were also issued to the independent directors of the Seligman Funds. Complaint,

¶ 14. No suit has been brought by the independent directors of the Funds to enjoin the Attorney

General's investigation into possible fraud in connection with the setting of advisory fees, nor to

quash the subpoenas served upon them, which have been answered. Declaration of R. Verle

Johnson, ¶ 7. Nor, for that matter, have plaintiffs moved here for relief.

　　　　　　　　Although plaintiffs emphasize advisory fees, the Attorney General investigation

has several facets. One facet, partially but inaccurately described in the Complaint, concerns

apparent fraudulent conduct in Seligman's secret arrangements with certain preferred customers,

---

[1] The Declaration of R. Verle Johnson ("Johnson Decl."), which describes the ongoing enforcement investigation of the Attorney General, is submitted in support of that branch of the motion that seeks dismissal on Younger abstention grounds.

[2] In fact, certain information relating to advisory fees had been sought by subpoena several months earlier in the investigation, and Seligman, without objection, produced information relating to advisory fees in response to that subpoena. Johnson Decl. ¶ 5 & Ex. A.

3

permitting these preferred customers to engage in mutual fund timing activities that negatively impacted the investment returns to Seligman Funds' other shareholders. Complaint, ¶ 9 (admitting Seligman entered into "arrangement with a Chicago-based brokerage firm to permit a limited amount of frequent trading in certain of the mutual funds managed by Seligman" which warranted "restitution to the four Funds affected").

Another facet of the ongoing investigation – the facet which apparently prompts Seligman's instant complaint – inquires into possible fraudulent conduct by Seligman or others connected with Seligman, in connection with the advisory fees paid to Seligman by the Seligman Funds. This aspect of the ongoing investigation is also noted in the Complaint. See Complaint, ¶ 11 (referring to "advisory fee negotiation process at Seligman" being subject of discussion with State Attorney General during settlement talks); ¶ 14 (referring to issuance of investigatory subpoenas by the Attorney General's Office that seek information not just concerning "frequent trading" but also "advisory fee negotiations between Seligman and the independent directors of the Seligman Funds").

In fact, the Attorney General is investigating at least three possible frauds under the Martin Act, one relating to a misrepresented market timing policy, allowing purportedly prohibited activities that appear to have cost Fund shareholders over $80 million since 1998; a second arising out of a misleading press release creating the false impression that restitution payments made by Seligman to the Funds fully compensated shareholders for the harm they suffered; and a third examining whether Seligman or others engaged in fraudulent conduct relating to Seligman's advisory fees. Johnson Decl. ¶ 9.

4

The Attorney General is continuing to investigate the practices of Seligman,

including by the subpoenas at issue in this case, and by means of a state court proceeding filed on

September 28, 2005, pursuant to Section 354 of the General Business Law ("GBL"), to obtain

Seligman and Seligman Funds' testimony, papers, documents and books in connection with a

strategy of trading mutual funds on a short-term basis. A judicial order granting that application

has been issued by the New York State Supreme Court, County of New York. Johnson Decl.

¶ 10 & Ex. C. Out of respect for this Court's jurisdiction over the matter before it, the state

court Section 354 application did not, at this juncture, seek the objected-to information relating

to advisory fees which plaintiffs challenge here.

## **Legal and Regulatory Background**

### A.    The Martin Act

In the early days of the twentieth century, many fraudulent stock schemes were so

transparent that they were said to have no more merit than "the blue sky above." In 1911 states

began passing so-called "Blue Sky" laws to control bogus stock sales. Virtually all of the states

had passed such laws by the time the first federal securities laws were enacted in 1933 and 1934,

in response to the Crash of 1929 and the ensuing Great Depression. The Martin Act, General

Business Law § 352, New York's Blue Sky law, was passed in 1921.

The Martin Act enables the Attorney General to investigate fraud, including by issuance

of subpoenas:

> 1. Whenever it shall appear to the attorney-general... that in the issuance, exchange,
> purchase, sale, promotion, negotiation, advertisement, investment advice or distribution
> within or from this state, of any stocks, bonds, notes, evidences of interest or
> indebtedness or other securities . . . a partnership, corporation, company, trust or
> association, or any agent or employee thereof . . . shall have employed, or employs, or is

5

about to employ any <u>device, scheme or artifice to defraud</u> . . . or employs, or is about to employ, any <u>deception, misrepresentation, concealment, suppression, fraud, false pretense or false promise</u>, or shall have engaged in or engages in or is about to engage in any practice or transaction or course of business relating to the purchase, exchange, investment advice or sale of securities or commodities which is fraudulent or in violation of law and which has operated or which would operate as a fraud upon the purchaser, or that any broker, dealer, or salesman . . . [the Attorney General] may in his discretion . . . which he believes . . . [in] the public interest to investigate, . . . may also require such other data and information as he may deem relevant and may <u>make such special and independent investigations as he may deem necessary in connection with the matter</u>.

2. The attorney-general, his deputy or other officer designated by him is empowered to subpoena witnesses, compel their attendance, examine them under oath before him or a magistrate, a court of record or a judge or justice thereof and <u>require the production of any books or papers which he deems relevant or material to the inquiry</u>.

Gen. Bus. Law § 352(1) and (2) (emphasis added). The Act provides for civil enforcement of its

provisions by the State Attorney General alone. C.P.C. International, Inc. v. McKesson Corp., 70

N.Y. 2d 268 (1987) (no private right of action under Martin Act).

B.     Securities Fraud Investigations Under the Martin Act

As noted, New York and other states, beginning in the 1920s, began to play an

important role in the investigation of fraudulent practices in our financial markets. See, e.g.

People v. Federated Radio Corp., 244 N.Y. 33 (1926); People v. Rice, 221 A.D. 443 (First Dept.

1927); Dunham v. Ottinger, 127 Misc. 683, 688 (Sup. Ct. Albany Co. 1926). In the 1970s,

numerous Martin Act enforcement proceedings were brought to challenge improper securities

offerings and commodities fraud. See, e.g., People v. Kaufman & Broad Homes, Inc., 89 Misc.

2d 769, 771 (N.Y. App. Term Second Dept. 1977); People v. Stern, 86 Misc. 2d 101, 102 (Sup.

Ct. N.Y. Co. 1976). The law was also used to protect investors against "boiler room" activities

and high-pressure sales operations. E.g., Gardner v. Lefkowitz, 97 Misc.2d 806 (Sup. Ct. N.Y.

Co. 1978).

6

In the 1990s, some have perceived that the SEC failed to pursue vigorously the various problems in financial reporting by public companies, conflicts of interest in investment banking, and agency problems in mutual funds. See Jonathan R. Macy (Sam Harris Professor of Corporate Law, Corporate Finance, and Securities Law, Yale Law School), *The SEC at 70: Positive Political Theory and Federal Usurpation of the Regulation of Corporate Governance: the Coming Preemption of the Martin Act*, 80 Notre Dame L. Rev. 951, 958 (March, 2005) (suggesting that "[t] his passivity on the part of the SEC was likely caused by the agency's capture by the very special interests it was ostensibly regulating.") Investigations by the States became critical to identifying and remedying serious problems affecting the securities markets. Martin Act investigations conducted by the State Attorney General in the last several years located and addressed significant industry failings. See Macy, supra; see also Supp. Practice Commentary, Vol. 19 McKinney's Gen. Bus. Law §§ 352-399-m (2005), at pp. 2-4, 6-9, 13-16, 21-24 (summarizing enforcement actions undertaken in NY State under Martin Act in recent years).

## ARGUMENT

### POINT I
### ABSTENTION IS APPROPRIATE UNDER YOUNGER v. HARRIS

## A. Younger v. Harris Requires Federal Courts to Refrain from Interfering with Ongoing State Proceedings.

Under Younger v. Harris, 401 U.S. 37 (1971), federal courts must refrain from exercising their jurisdiction to enjoin state proceedings that are ongoing at the time federal intervention is sought. Younger, 401 U.S. at 43-44; see also Diamond "D" Construction Corp v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002) (federal courts are generally required "to abstain

from taking jurisdiction over federal . . . claims that involve or call into question ongoing state

proceedings."). The doctrine is a necessary product of "Our Federalism":

> [A] system in which there is sensitivity to the legitimate interests of both State and
> National Governments, and in which the National Government, anxious though it
> may be to vindicate and protect federal rights and federal interests, always
> endeavors to do so in ways that will not unduly interfere with the legitimate
> activities of the States.

Younger, 401 U.S. at 44.

Given the doctrine's service to this broad purpose, Younger abstention applies not

just to state criminal matters, but also to ongoing state proceedings that are civil or administrative

in nature. Huffman v. Pursue, Ltd., 420 U.S. 592 (1975); Ohio Civil Rights Comm'n v. Dayton

Christian Schools, Inc., 477 U.S. 619 (1986); University Club v. City of New York, 842 F.2d 37

(2d Cir. 1988); Christ the King Regional High School v. Culvert, 815 F.2d 219, 223-24 (2d Cir.),

cert. denied, 484 U.S. 830 (1987). The doctrine, grounded upon principles of federalism and

comity, "rests foursquare on the notion" that a state proceeding constitutes a sufficient forum for

the vindication of federal rights. Diamond "D," supra, 282 F.3d at 198. "[W]hen Younger

applies, abstention is mandatory and its application deprives the federal court of jurisdiction in

the matter." Id. at 197. And, "[a]ny uncertainties as to the scope of state proceedings or

availability of state remedies are generally resolved in favor of abstention." Spargo v. New York

State Comm'n on Judicial Conduct, 351 F.3d 65, 78 (2d Cir. 2003) (citation omitted), cert.

denied, 541 U.S. 1085 (2004).

As argued below, Younger should apply here. Once a prosecutorial arm of the

State has initiated a proceeding to investigate a criminal or civil violation of state law, and has

invoked a compulsory or coercive power of the State in connection with that investigation –

8

which, if the facts warrant, will result in an adjudication of whether there has been a violation of state law – a federal court ought to abstain from interfering with the ongoing State prosecutorial investigation in deference to the State's ample and available judicial remedies.

## B.   Because the Younger Doctrine Applies to the State Attorney General's Ongoing Martin Act Proceeding, this Court Should Refrain from Exercising Jurisdiction.

The Second Circuit applies a three-prong test for determining the applicability of the Younger abstention doctrine: "(1) whether there is an ongoing state proceeding; (2) whether an important state interest is involved; and (3) whether the federal plaintiff has an adequate opportunity for judicial review of his . . . claims during or after the proceeding." Christ the King Regional High School v. Culvert, 815 F.2d at 224.  See also Hansel v. Town Court, 56 F.3d 391, 393 (2d Cir.), cert. denied, 516 U.S. 1012 (1995); Temple of the Lost Sheep, Inc. v. Abrams, 930 F.2d 178, 182 (2d Cir.), cert. denied, 502 U.S. 866 (1991).  All three prongs are satisfied in this case, as shown below.  Accordingly, the Court is urged to abstain.

### 1.   The State is Conducting an Ongoing Proceeding Concerning Seligman and Zino.

The complaint concedes that the State Attorney General is conducting an ongoing investigation into practices of Seligman (of which Zino is the President) and the Seligman Funds that was begun in February 2004.  Complaint ¶ 9; see also ¶ 10 (investigation has "continued for well over a year.").  Seligman provided extensive materials to the Attorney General and the SEC. Id. ¶ 14.  Based upon admitted wrongdoing in one area, there were settlement negotiations that covered various other Seligman practices. Id. ¶¶ 9-11.  Negotiations broke down because the parties could not agree to terms. Id. ¶¶ 11-13.  Seligman claims that the Attorney General threatened to, and did, broaden the investigation to include advisory fees, Id. ¶¶ 13 - 14,

9

although Seligman also admits that it had already had discussions with the Attorney General about its advisory fees during the initial investigation. Id. ¶ 11. In any event, the Attorney General issued subpoenas to Seligman's president, Zino (and others) as part of its investigation in August 2005, which Zino and Seligman ask this Court to quash insofar as those subpoenas seek information relating to advisory fees (although they have yet to make any application to this Court for such relief). Id., ¶¶ 11-15 & Wherefore Clause.[3]

Thus, there is no question that there has been an ongoing New York State Attorney General's investigation for a year and a half with substantial information investigated and certain areas of purported wrongdoing identified. Moreover, prior to the commencement of this lawsuit, a subpoena had been issued by the State Attorney General upon Zino. Where the relief sought from the federal court would interfere with or enjoin an ongoing state investigation, including the enforcement of state-sanctioned subpoenas, the Younger doctrine, and the comity concerns that animate it, support a federal court's deferring to the state's available judicial processes for a hearing of plaintiffs' challenge.

In Juidice v. Vail, 430 U.S. 327 (1977), for example, the Supreme Court applied the Younger doctrine to a situation in which there was no formal state court proceeding pending other than subpoena enforcement. Subpoenas had been issued by a judgment creditor's attorney against a judgement debtor under New York law. See N. Y. Civ. Prac. Law §§ 5223 and 5224 (McKinney 1963). When the subpoenas were not answered, the judgment creditor sought contempt for failure to comply with the subpoenas. The judgment debtors brought suit in federal

---

[3]     A more accurate and complete account of the investigational proceedings is provided in the accompanying Declaration of R. Verle Johnson, dated October 3, 2005.

10

court to declare the statutory contempt process unconstitutional and to enjoin it. The Supreme

Court held that the district court should have abstained from interfering with the state

proceedings under Younger. As to the underlying principle behind the abstention, the Supreme

Court opined:

> [We ] now hold, however, that the principles of Younger and Huffman are not
> confined solely to the types of state actions which were sought to be enjoined in
> those cases. As we emphasized in Huffman, '"the "'more vital consideration'"
> behind the Younger doctrine of nonintervention lay not in the fact that the state
> criminal process was involved but rather in "'the notion of 'comity,' that is, a
> proper respect for state functions, a recognition of the fact that the entire country
> is made up of a Union of separate state governments, and a continuance of the
> belief that the National Government will fare best if the States and their
> institutions are left free to perform their separate functions in their separate
> ways.'" Huffman, 420 U.S., at 601, quoting Younger, 401 U.S., at 44.

430 U.S. at 334.

The Supreme Court not only recognized New York State's significant interest in

the enforcement of subpoenas pursuant to its state contempt laws, but also relied on the ability of

the subpoenaed persons in Juidice to present their federal claims in New York state court

proceedings, either at a contempt hearing or even, after an order of contempt had been issued, by

a motion to vacate pursuant to N.Y. Civ. Prac. Law § 5015 (McKinney Supp. 1976-1977).   The

Court noted that the subpoenaed party would have had final recourse to the Supreme Court, 28

U.S.C. § 1257(2), noting that "no more was required to invoke Younger abstention." 430 U.S.

at 337.

Here, as in Juidice, plaintiffs seek to have a federal court interfere with New York

State's subpoena enforcement process. In the present instance, the subpoenas were not issued by

a judgment creditor, in furtherance of his or her investigation of a judgment debtor's assets, but

11

by a state officer, the State Attorney General, pursuant to New York's General Business Law § 352 and Executive Law § 63(12), to further a Martin Act investigation into, among other things, possible fraudulent conduct affecting Seligman's advisory fees. Juidice establishes that the Younger doctrine is not "confined solely to the types of [criminal and civil enforcement] state actions" at issue in Younger and Huffman, 430 U.S. at 334, but instead, embraces within the "state proceeding" requirement the state statutory process of issuance and enforcement of subpoenas, whether regarded as criminal, quasi-criminal, or civil in nature. Id. at 337. Accordingly, the open state subpoenas issued by the State Attorney General to the plaintiffs in aid of the Office's ongoing Martin Act investigation, should satisfy the first prong of the Younger abstention test.

The fact that this federal suit was brought by the plaintiffs *prior* to the return date of the state subpoenas, and hence prior to the State Attorney General's commencement of a subpoena enforcement proceeding in state court, ought not dictate any different outcome. While generally speaking, federal courts invoke the Younger doctrine when a state judicial proceeding is pending at the time the federal suit is initiated, the doctrine also may apply even when a state prosecution begins after the federal complaint has been filed: "Where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of Younger v. Harris should apply in full force." Hicks v. Miranda, 422 U.S. 332, 349 (1975). Any other approach might invite subjects of state criminal or civil investigations to partake in an unsavory "race to the courthouse." Id. at 354.

12

Thus, the policy behind Younger has been extended to state investigations when

proceedings are imminent, as the Circuit Court ruled in Kingston v. Utah County, 1998 U.S.

App. LEXIS 22005, *11-14 (10th Cir. 1998):

> In this case, the defendants had begun an investigation and executed a search warrant to
> obtain the evidence they considered necessary to support criminal charges. Ms. Kingston
> then filed her federal complaint with the likely knowledge that criminal charges were
> imminent.
>
> * * *
>
> We conclude these facts are sufficient to establish the existence of a pending state
> criminal proceeding. Although Ms. Kingston had not been charged, the allegedly illegal
> activity had already taken place, the investigation had been conducted, the search warrant
> had been executed, the necessary evidence had been obtained, and the charges would
> have been filed absent the district court's intercession. It was clear at the time this action
> was filed that Ms. Kingston would have had an immediate opportunity to challenge the
> validity of the warrant in state court. The Supreme Court has stated the Younger doctrine
> applies to "about-to-be-pending" state criminal proceedings. Morales v. Trans World
> Airlines, Inc., 504 U.S. 374, 381 n.1, 119 L. Ed. 2d 157, 112 S. Ct. 2031 (1992). Other
> courts have invoked the Younger doctrine and have abstained from consideration of
> similar challenges to criminal investigations. See Kaylor v. Fields, 661 F.2d 1177, 1182
> (8th Cir. 1981) (concluding issuance of prosecuting attorney's subpoena was pending state
> criminal proceeding); Nick v. Abrams, 717 F. Supp. 1053, 1056 (S.D.N.Y. 1989) (ruling
> execution of search warrant was pending state proceeding); Law Firm of Daniel P. Foster,
> P.C. v. Dearie, 613 F. Supp. 278, 280 (E.D.N.Y. 1985) (deciding grand jury subpoena
> was pending state criminal proceeding). We agree with the statement of one of those
> courts, that
>
> > permitting the targets of state criminal investigations to challenge subpoenas or
> > search warrants in federal court prior to their indictment or arrest ... would do as
> > much damage to principles of equity, comity, and federalism as allowing federal
> > courts to suppress the fruits of subpoenas or search warrants in ongoing state
> > criminal trials.

Kingston V. Utah, 1998 U.S. App. LEXIS 22005, at *11-14, quoting Nick v. Abrams, 717 F.

Supp. 1053, 1056 (S.D.N.Y. 1989).

The Southern District case cited with approval, supra, by the Tenth Circuit, Nick

v. Abrams, 717 F. Supp. 1053 (S.D.N.Y. 1989), held it was reasonable to conclude there was "a

pending state proceeding" for purposes of Younger abstention "when a state attorney general

13

executes a search warrant authorized by a judge during a criminal investigation prior to arrest or indictment." Nick, 717 F.Supp. at 1056. As noted above, the "equity, comity, and federalism" principles animating Younger were viewed as equally applicable to the investigational stage of the state's prosecution, "common sense dictat[ing] that a criminal investigation is an integral part of a criminal proceeding." Id.

Indeed, inviting parties who are the subject of investigation and lawfully served with subpoenas or warrants to rush to federal court to quash subpoenas or search warrants served by a sovereign arm of the State, prior to the State having the opportunity to enforce those very instruments would ill-serve the weighty equity and comity concerns advanced by the Younger doctrine. See Law Firm of Daniel P. Foster, P.C., v. Dearie, 613 F.Supp. 278, 280 (E.D.N.Y.1985) ("Thus, were the court to grant the relief sought, the immediate and direct effect would be to enjoin the state court from enforcing its order to comply with the subpoena and the state from pursuing" the investigation); O'Shea v. Littleton, 414 U.S. 488, 498-499 (1974) ("recognition of the need for a proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers engaged in the administration of the State's criminal laws in the absence of a showing of irreparably injury which is 'both great and immediate.'"), citing Younger v. Harris, 401 U.S. at 46.

But even were the subpoenas issued by this Office not specifically placed at issue by the plaintiffs, the ongoing investigation by the State Attorney General into possible violations of the Martin Act by Seligman, Zino and others, which has now ripened into a state court-supervised proceeding under section 354 of the Martin Act, should itself satisfy the "ongoing proceeding" requirement. Following its decision in Juidice, the Supreme Court held, in

14

<u>Middlesex Co. Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423, 433-34 (1982), that

<u>Younger</u> abstention applied to state fact-gathering administrative proceedings that were ongoing

at the time of federal suit.  Plaintiffs acknowledge that the State Attorney General is conducting a

proceeding pursuant to the Martin Act, investigating facts, including, specifically, whether facts

demonstrate fraud in connection with advisory fees to be paid Seligman, and the investigation

was ongoing prior to their commencement of their federal lawsuit.  Complaint, ¶¶ 2, 11-14 &

Exhibit A (containing excerpt of subpoena issued pursuant to Martin Act).    Indeed, the reason

plaintiffs have brought this lawsuit is to ask the federal court to interfere with the ongoing state

fact-gathering proceeding being conducted by the State Attorney General, including the State's

enforcement of its subpoenas.

   The courts of this Circuit sensibly have applied <u>Middlesex</u> to such ongoing, fact-

intensive investigations by state authorities.  Recently, in <u>Spargo v.  New York State Comm'n</u>

<u>on Judicial Conduct</u>, 351 F.3d 65 (2d Cir. 2003), <u>cert</u>. <u>denied</u>, 541 U.S. 1085 (2004), the Circuit

held that a trial court had erred in not abstaining from hearing federal constitutional challenges

brought before it by a person subject to state administrative proceedings of the State

Commission on Judicial Conduct.  Under <u>Middlesex</u>, <u>Spargo</u> regarded <u>Younger</u> abstention as

required even where state administrative proceedings had been described as "non-adjudicative

in nature, and primarily 'designed to elicit facts, not legal arguments.'" <u>Spargo</u>, 361 F.3d at 76,

quoting the <u>Middlesex</u> Third Circuit opinion, 643 F.2d at 126.

   Under circumstances very similar to those presented here, this district court, in

<u>Hip-Hop Summit Action Network v. N.Y. Temp. State Comm'n on Lobbying</u>, 2003 U.S. Dist.

LEXIS 21229 (S.D.N.Y. Nov. 25, 2003), not long ago held that an investigation by the state

15

agency charged with investigating and administratively prosecuting violations of the State's lobbying laws, which had not yet culminated in any state hearing before a court or administrative body, was an "ongoing proceeding" for purposes of Younger abstention, requiring the district court to abstain from exercise of jurisdiction over the claims advanced by the subject of the investigation that their constitutional rights were being infringed. Hip-Hop, 2003 U.S. Dist. LEXIS 21229 *8. In that case, much as here, the federal plaintiffs sued in response to subpoenas (which, as here, were subpoenas the agency was empowered by state law to issue *without* court-order).[4] The subpoenas had been served by the state officers granted the authority under state law to investigate possible Lobbying Act violations. Id., at * 11-12 (agency has "duty" to conduct investigations and enforce provisions of Lobbying Act). At the time of the commencement of the federal court action, the matter was still "in its investigatory phase": "[t]he Commission had issued official inquiry notices and subpoenas, and no formal charge had been made." Id. at *13, 14. The court noted ambiguities in the record as to whether, at the time shortly before its ruling, the investigatory phase "seem[ed] to be at an end," id. at * 14, but this did not bear on the court's ultimate conclusion that Younger abstention applied. Id. at *15 ("While one might debate how far the investigation by the Commission has proceeded here, Plaintiff's contention has always been that their First Amendment rights were violated by the very commencement of the investigation and will continue to be violated if the investigation is permitted to proceed."). The critical factor for the court (without regard to whether the investigation had reached a charging stage) was that procedures were available

_____

[4] See N.Y. Legis. Law § 1-d(c)(2)(providing Lobbying Commission with administrative subpoena power).

16

under state law for plaintiff to obtain a remedy from a state court if they believed that the subpoenas or the investigation by itself impaired their constitutional rights. Id. at *16 (concluding that with respect to quashing of subpoenas *or* enjoining the entire investigation, "[p]laintiffs can obtain in the State court all the relief they seek here.")

Here, much as in Hip-Hop, an ongoing fact-based investigational proceeding inquiring into possible violations of state law is ongoing. This investigation, addressing, inter alia, possible fraudulent conduct affecting advisory fees paid to Seligman by the Seligman Funds, is being conducted by the state official entrusted with that prosecutorial authority, pursuant to the Martin Act, aided by subpoena powers provided by that and other state laws. And, without doubt (see infra, pp. 19-21), New York's state courts are equipped to determine whether the challenged portions of the subpoenas, or the investigation into possible fraud with respect to advisory fees, are lawful. The decisional law, stretching from Younger to Huffman to Juidice to Middlesex, to Spargo and Hip-Hop Summit, thus supports the application of Younger abstention doctrine to this ongoing state proceeding conducted by a sovereign prosecutorial arm of the state into possible state law violations.

2. The Attorney General's Martin Act Fraud Investigations, and Similar Securities Investigations by other States, Further Important State Interests.

Younger abstention is intended to protect from federal judicial interference state proceedings that serve substantial state interests. States have a palpable and significant interest in investigating and preventing fraudulent conduct, a traditional area of police power, including by companies and persons engaged in selling and investing in securities. Given the significant role the states have historically played in investigating securities-related fraud (see supra, pp. 5-

17

7) – a role which in recent years they have performed with even greater visibility and impact – there can be no doubt that this second prong of the Younger test is met.

Plaintiffs themselves recognize in their complaint "the work [Defendant] has done in the public interest" in connection with investigations within the securities field. Complaint ¶ 4 (objecting only to Attorney General's investigation of their dealings with respect to investment company advisory fees, not his "proper investigatory province" of which they are "respectful").[5]  The second prong of the Younger test does not, of course, depend upon the views of an investigational subject as to whether the state investigating agency is acting appropriately in pursuing a particular fraud investigation or a series of them. Rather, the relevant question is whether the states have a recognized, substantial interest in investigating fraudulent conduct affecting investors.

The express preservation of fraud jurisdiction to the states in the federal securities laws, even while Congress was creating other distinct roles for the federal government, demonstrates that the answer is a resounding yes. See discussion infra, pp. 23-27.

_____

[5]  That plaintiffs urge that the challenged investigation is preempted under the Supremacy Clause, rather than advancing an asserted violation of some other right conferred by the Constitution, should not affect the Younger abstention analysis. While a Second Circuit panel did glancingly observe, in a footnote, more than twenty years ago, that "abstention . . . is not appropriately invoked in a preemption case," Stone & Webster Engineering Corp. v. Isley, 690 F.2d 323, 326 n.2 (2d Cir. 1982) (responding to a point advanced in that appeal not by a party but rather, in an amicus brief), that observation ought not have any continuing vitality in view of subsequent Supreme Court consideration of the matter. In New Orleans Public Service, Inc. v. Council of the City of New Orleans, 491 U.S. 350, 365 (1989), the Supreme Court placed Supremacy Clause preemption challenges on the same footing as all other constitutional challenges in the context of Younger abstention, noting that "[t]here is no greater interest in enforcing the supremacy of federal statutes than in enforcing the supremacy of explicit constitutional guarantees, and constitutional challenges to state action, no less than pre-emption based challenges, call into question the legitimacy of the State's interest in its proceedings reviewing or enforcing that action.").

18

Congressional recognition of the states' vital and continuing interest in protection against fraud is evident in the legislative history of the several securities acts.  Id.

More fundamentally, as the Supreme Court has recognized in Younger v. Harris, Huffman v. Pursue, and  Trainor v. Hernandez, 431 U.S. 434 (1977), the states have very substantial interests in investigating and prosecuting violations of their state laws, whether a state prosecutor is acting pursuant to criminal (as in Younger) or civil enforcement (as in Huffman and Trainor) powers.  As stated in Trainor, 431 U.S. at 444, the principles behind Younger abstention "are broad enough to apply to interference by a federal court with an ongoing civil enforcement action . . . brought by the State in its sovereign capacity."

3.    New York's Laws Provide A Ready Vehicle for Plaintiffs to Challenge the
       Subpoenas or the Attorney General's Investigation in State Court.

The third abstention prerequisite – a state court opportunity to vindicate federal rights – is present here as well.  If plaintiffs believe that the subpoenas in question are invalid, due to alleged federal preemption, New York State law affords a ready means by which they may  challenge the subpoenas on that (or any other) ground.   Plaintiffs may move to quash the subpoenas in state court under CPLR § 2304.  See Juidice, 430 U.S. at 337.

Failing such a motion by plaintiffs, and failing compliance with the subpoenas, the State Attorney General will likely commence an enforcement proceeding with respect to the subpoenas in state court pursuant to CPLR § 2308(b), or amend the existing state court proceeding under General Business Law §354 to seek such discovery,  at which proceeding plaintiffs may assert  their legal position to the state court, including any legal position based on federal law.   New York law provides ample means by which plaintiffs may have any asserted

19

grounds for quashing the subpoenas, including any asserted federal-law based grounds,
considered and ruled upon by a state court judge who has sworn an oath to uphold the U.S.
Constitution, which includes, of course, the Supremacy Clause.

Moreover, to the extent that plaintiffs seek relief beyond quashing of the
subpoenas from this Court, such as an injunction from further investigation by the State
Attorney General into possible fraudulent conduct in connection with the setting of Seligman's
advisory fees and expenses, New York law also provides a procedural vehicle for seeking such
relief from New York state courts. Plaintiffs may challenge the State Attorney General's
actions in a state court proceeding. As the Second Circuit observed in N.Y. State NOW v.
Pataki, 261 F.3d 156, 168 (2d Cir. 2001), cert. denied 534 U.S. 1128 (2002), state court review
by mandamus or prohibition prior to a final agency determination satisfies Younger. In
Diamond "D," the Second Circuit specifically noted that state court mandamus review during an
agency proceeding fulfills the third Younger prong. 282 F.3d at 202. See also Hip-Hop, supra,
* 14-16 (noting availability of state court prohibition proceedings to stop investigation by state
officer alleged to be in excess of its authority).

Here, plaintiffs claim the State Attorney General is acting in excess of his
enforcement authority by investigating possible fraudulent conduct in connection with
investment advisory fees, Complaint ¶ 4 ("he has exceeded his authority and intruded himself
into an area assigned by Congress to the SEC"). The Second Circuit has held that "to avoid
abstention, plaintiffs must demonstrate that state law bars the effective consideration of their
[federal] claims." Spargo, 351 F.3d at 78. Plaintiffs cannot meet that burden here. The laws of
the State of New York provide ample means for plaintiffs to press before a state court their

20

federal claim of preemption. As recognized in Spargo, Younger "directs federal courts to defer
to state procedures, leaving state institutions 'free to perform their separate functions in their
separate ways.'" Id. at 80, quoting Younger, 401 U.S. at 44. This Court should abstain in this
action, so that the state courts may adjudicate plaintiffs' claims, without unnecessary federal
interference with an ongoing state enforcement investigation into possible violations of state
law.

## POINT II

## THE STATE ATTORNEY GENERAL IS NOT PREEMPTED
## FROM INVESTIGATING FRAUD IN CONNECTION WITH ADVISORY FEES.

Plaintiffs assert that the Investment Company Act of 1940 ("ICA") preempts the
State Attorney General from conducting an investigation into whether fraud has occurred in
connection with the advisory fees paid to Seligman by the Seligman Funds. Complaint ¶¶ 1-5,
15. Plaintiffs' extremely novel and broad claim – apparently that in view of §36(b) of the ICA,
the Act preempts all state laws and state actions relating to "advisory fees," including any fraud
investigation or lawsuit by a state attorney general that relates at all to the subject matter of
"advisory fees" paid to investment advisers by a registered investment company – finds no
genuine support in the ICA itself, its legislative history, or in the judicial construction of the Act
and its amendments.

## A.   The ICA Does Not Expressly Preempt State Fraud Enforcement Nor Has Congress
## Revealed a Purpose to Occupy the Field of Securities Regulation.

The preemption doctrine derives from the Supremacy Clause of the Constitution,
which states that the "Constitution and the laws of the United States. . . shall be the supreme law
of the land . . . anything in the constitutions or laws of any State to the contrary

21

notwithstanding." U.S. CONST. Art. VI, cl. 2. Courts have considered three types of
preemption: express preemption, field preemption and conflict preemption.

Preemption is "express" when Congress, by explicit statutory command, directs
that state law be displaced. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 382
(1992). Plaintiffs do not cite any federal statute that expressly prohibits the Attorney General's
investigation of frauds in connection with advisory fees nor could they. As the Third Circuit has
held, in an opinion directly considering the precise challenge raised here, a party would be
"precluded from making such an argument because neither §36(b), nor any other section of the
ICA, contains an 'explicit statutory command' indicating that federal law preempts and thereby
displaces state law." Green v. Fund Asset Management, 245 F.3d 214, 223 n.6 (3d Cir. 2001),
cert. denied 537 U.S. 884 (2002).

Field preemption of state law arises where Congress has "occupied the field" in
which the state is attempting to regulate. To trigger field preemption, the preemptive force of a
federal statute must be "so powerful as to displace entirely any state cause of action." Franchise
Tax Bd. of Cal. v. Construction Laborers Vacation Trust for S. Cal., 463 U.S. 1, 23-24 (1983);
Bates v. Dow Agrosciences LLC., ___ U.S. ___, 125 S.Ct. 1788, 1801 (2005)). Congress'
intent must be plainly evident from a scheme of federal regulation "so pervasive as to make
reasonable the inference that Congress left no room for the States to supplement it," Rice v.
Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947), or the "federal interest [be] so dominant
that the federal system will be assumed to preclude enforcement of state laws on the same
subject." Id., 331 U.S. at 219.

22

Very few statutes possess the "'extraordinary pre-emptive power' required to occupy a field of law so entirely as to characterize any claims arising thereunder as federal." Zuri-Invest AG v. Natwest Finance Inc., 177 F.Supp.2d 189, 195 (S.D.N.Y. 2001), quoting Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 65 (1987). The ICA clearly is not such a statute. As the Green court concluded, such an argument is wholly untenable "since it is well-settled that neither the ICA alone nor all federal securities laws taken together occupy the field of corporate law or securities law." Green, 245 F.3d at 223 n.7, citing Burks v. Lasker, 441 U.S. 471, 477 (1979) and additional authorities. See also Zuri-Invest AG v. Natwest Finance Inc., 177 F.Supp.2d 189 (S.D.N.Y. 2001) (federal law does not enjoy complete preemptive force in the field of securities).

Indeed, state securities laws exist in every state, the District of Columbia, and Puerto Rico, see, e.g, the Uniform Securities Act, National Conference of Commissioners On Uniform State Laws (last revised in 2005), and the states have enjoyed broad and longstanding powers to take action with respect to such diverse subjects as fraud in the sale or purchase of securities and the rendering of investment advisory services. See, e.g., Baker, Watts & Co. v. Miles & Stockbridge, 876 F.2d 1101, 1107 (4th Cir.1989).[6]

---

[6] As discussed infra, p. 5, States have regulated securities, and brought enforcement actions against security-related frauds, since early in the 20th Century. After the '29 Crash, Congressional enactment of the1933 and 1934 Acts (each of which prohibits, *inter alia*, fraud in the purchase and sale of securities) ushered in a dual state and federal regime involving both hybrid regulation (as by overlapping registration requirements) and antifraud enforcement (providing for state and federal governments each to pursue remedies for fraud). See Di Trolio, Sefania A., *Public Choice Theory, Federalism, and the Sunny Side to Blue Sky Laws*, 30 Wm. Mitchell L.Rev. 1279, 1291-92 (2004). Congress, recognizing the traditional role performed by the states and state laws in these areas, noted in the '33 and '34 Acts that the rights and remedies provided by each shall be "in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. §§ 77p(a), 78bb(a). Since that time, Congress has generally left the

23

## B. There Is No Conflict Between a State Fraud Investigation and the ICA

Since it is well established that federal securities laws do not occupy the field,

plaintiffs' contention must concern the third type of preemption - "conflict" or "frustration"

preemption. State law may be displaced under conflict preemption principles (i) when it is

impossible to comply with both the state and the federal law, or (ii) when the court determines

state law "stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress." Orson, Inc. v. Miramax Film Corp., 189 F.3d 377, 381 82 (3d

Cir.1999) (en banc) (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977)), cert. denied

529 U.S. 1012 (2000).

Plaintiffs apparently contend that permitting state fraud investigations, such as

that being undertaken by defendant that touch upon advisory fees in any way, would constitute

---

1933 and 1934 savings provision untouched, amending these provisions only when it had formed
a clear purpose to preempt a particular form of state regulation or action. For example, the
Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), P.L. 105-353, 112 Stat. 3227
(1998) (codified as amended in part at 15 U.S.C. §§ 77p & 78bb(f)), completely prohibited
certain covered class actions brought under state law from being heard in either state or federal
court. Plaintiffs can point to no similar language in the ICA or its amendments expressing any
Congressional purpose to preempt traditional state fraud enforcement.

One distinguished securities law scholar worries that political pressures could lead to
preemption of state statutes addressed to securities fraud in the future, to the detriment of the
Public:

> State regulators, most notably New York's Attorney General Eliot Spitzer, moved
> decisively to fill what they viewed as a regulatory vacuum created by the SEC. The SEC
> and its congressional monitors have been forced to respond to this new competition. The
> long-run consequences of this competition, while far from clear, are likely to lead to a
> congressional counterattack in the form of preemption of New York's Martin Act. The
> capital markets will be weaker if this occurs.

Macey, supra, 80 Notre Dame L. Rev. at 973.

24

an interference with the Congressional purpose of the ICA. As shown below, the legal presumption is strongly against such a construction that would find this area of traditional state action preempted, and the text and legislative history of the ICA warrant this Court's outright rejection of plaintiffs' claim.

The Supreme Court has noted on multiple occasions that "because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86 (1996). Because of that presumption, the historic police powers of the States (which include the civil and criminal prosecution of frauds) will not be preempted absent the "clear and manifest purpose of Congress," such purpose being "the ultimate touchstone in every pre-emption case." Id. (internal quotation marks omitted). See also Chicago & Northwestern Transp. Co. v. Kalo Brick & Tile Co. , 450 U.S. 311, 317-18 (1981); New York State Dep't of Soc. Servs. v. Dublino, 413 U.S. 405, 414-15 (1973); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141-43 (1963). In the interest of avoiding unintended encroachment on the authority of the States, "a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663-64 (1993). If the field in question includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be "clear and manifest." Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977).

No such "clear and manifest" congressional intent to supersede state enforcement of state fraud laws has been expressed. Indeed, the contrary intent is evident. In 1996, Congress passed "An Act [t]o amend the Federal securities laws in order to promote efficiency

25

and capital formation in the financial markets, and <u>to amend the Investment Company Act</u> of

1940 . . . "   National Securities Markets Improvement Act ("NSMIA"), 104 P.L. 290 (emphasis

added).   By that amendment, which sought to simplify the thicket of state and federal

registration requirements, Congress partially preempted the pre-clearance registration role states

had long performed under their Blue Sky Laws, including with respect to mutual fund shares.

However, while taking from the states the pre-clearance registration functions they had engaged

in, Congress, in enacting NSMIA, made it quite clear that it did not wish to interfere with the

traditional anti-fraud enforcement functions of the fifty state governments.   Congress explicitly

stated its intention as follows:

> <u>Nothing</u> in this subsection <u>shall prohibit</u> the securities commission (or any agency or
> office performing like functions) of <u>any State from investigating and bringing</u>
> <u>enforcement actions with respect to fraud or deceit against an investment adviser</u> or
> person associated with an investment adviser.

National  Securities Markets Improvements Act, § 303(a)(amending Investment Advisers Act of

1940) (emphasis added), <u>codified</u> <u>at</u> 15 U.S.C. § 80b-3a(b)(2).[7]

               The legislative history of the 1996 amendments confirms this affirmative

intention on the part of Congress to allow states to continue to exercise fraud jurisdiction:

> [t]his <u>preservation of authority is intended to permit state securities regulators to</u>
> <u>continue to exercise their police power to prevent fraud</u> and broker-dealer sales practice
> abuses, such as churning accounts or misleading customers.

Conference Report, H.R. Conf. Rep. 104-864, 104th Cong., 2d Sess., at 40 (1996) (emphasis

added), <u>reprinted</u> <u>in</u> 1996 U.S.Cong. & Ad. News 3920, 3921; <u>see</u> <u>also</u> Commerce Committee

---

      [7]     <u>See</u> <u>also</u> NSMIA, § 102(a), <u>codified</u> <u>at</u> 15 U.S.C. § 77r(c)1 (like provision with
respect to fraud or deceit investigations and enforcement actions by states against brokers or
dealers).

Report at 34, reprinted in id. at 3897 (noting Congress' "intention not to alter, limit, expand, or otherwise affect in any way any State statutory or common law with respect to fraud or deceit" in connection with securities.) [8]

No language in the statute reveals any different, distinctive Congressional purpose with respect to a special subset of state statutory or common law fraud or deceit claims that involve investment advisory fees. The savings clause in the NSMIA legislation, which plainly was intended to preserve "[s]tate statutory or common law [remedies] with respect to fraud or deceit," id., contains no exception for a subspecies of state fraud claim that touched upon fraud in relation to advisory fees paid to mutual fund investment advisors. In view of the statutory text and the legislative, it is most reasonable to regard Congress's purpose, in amending the ICA, as having included preserving the traditional role of the states in conducting anti-fraud enforcements. It certainly legislated no different result with respect to frauds implicating advisory fees. Given that Congress gave express consideration to the scope of preemption of state law in the legislation, the absence of statutory language accomplishing

---

[8]      The same is revealed in statements of significant individual participants in the enactment of the legislative amendment. See, e.g., Remarks of Repr. Edward J. Markey, Ranking Demo. Member, Subcommittee on Telecommunications and Finance Markup of H.R. 3005 Securities Amendments of 1996 (March 7, 1996) 1996 WL 134449) ("On the very difficult and complex issue of state preemption, I believe that we have worked out an acceptable compromise that will preserve the critical role of the states in protecting investors against financial fraud. Both sides have agreed to preemption of state review of mutual fund offerings. At the same time, we've also agreed to drop proposals that would have preempted state authority to enforce state antifraud statutes."); Statement by President Clinton Upon Signing H.R. 3005, reprinted in 1996 U.S. Code Cong. & Ad. News, 3923 (States "retain[] their authority to take enforcement actions against fraudulent conduct in all situations."); Response of Matthew P. Fink to Written Questions from Senator D'Amato, Hearings before Sen. Comm. on Banking, Housing & Urban Affairs, U.S. Senate, 104th Cong., June 5, 1996, p. 163 (emphasis in original) (". . . State anti-fraud authority over written materials will be completely unaffected by S. 1815.") (Emphasis added).

plaintiffs' aims here – the preemption of any enforcement activity by the fifty states with respect to fraud relating to investment advisory fees – ought to be conclusive of the matter. See, e.g., Edgar v. MITE Corp., 457 U.S. 624, 631(1982) (where "Congress did not explicitly prohibit States from regulating takeovers," a statute's failure to amend a saving provision of the 1934 Act that preserved the jurisdiction of state securities commissions showed there was no basis to find conflict preemption).

Finally, even were plaintiffs to provide an "alternative reading" of the NSMIA or the ICA favoring preemption that was "just as plausible," the U.S. Supreme Court's most recent preemption decision, Bates v. Dow Agrosciences LLC, __ U.S. __, 125 S.Ct. 1788, 1801 (2005), reinforces the message that this Court "would nevertheless have a duty to accept the reading that disfavors preemption." Because the States are "independent sovereigns in our federal system," it must be "presumed that Congress does not cavalierly preempt state-law causes of action. In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" Id. at 1801.

## C.   Courts Considering the Issue Have Rejected ICA Preemption of State-Law Fraud Claims.

For essentially the reasons set forth above, the few courts that have considered the novel claim that plaintiffs present have rejected ICA preemption of state-law fraud claims. Green v. Fund Asset Management, L.P., 245 F.3d 214, 230 (3rd Cir. 2001), cert. denied, 537 U.S. 884 (2002), specifically addressed the issue of whether state claims for breach of fiduciary duty and deceit were preempted by the ICA. The Third Circuit Court of Appeals soundly

28

rejected the assertion that these state law-based claims were preempted by the Act, the precise claim pressed by plaintiffs here.

Defendants were, *inter alia*, partners in and the chief investment officer of an investment advisor to investment companies registered with the SEC. Green, 245 F.3d at 218-19. The state claims were based on the manner in which an investment advisory fee was calculated and the disclosure (or lack thereof) of the calculation. 245 F.3d at 229. Defendants in Green, in urging the federal court's dismissal of the state law claims presented in the suit, specifically relied on § 36(b) of the ICA, the same section of the same federal statute upon which Seligman relies in the present suit. That section states:

For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission [SEC], or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person . . . for breach of fiduciary duty in respect of such compensation . . .

ICA, § 36(b), codified at 15 U.S.C. § 80a-35(b). In light of that federal-law imposed fiduciary duty, the enforcement of which the Act expressly gave to the SEC, defendants argued that any state-law based claims for deceit or breach of fiduciary duty should necessarily be regarded as preempted by the Act, much as plaintiffs do here. See Complaint, ¶ 2 (quoting same § 36(b) as basis for action).

The Court started its analysis with the understanding that it had a conflicts preemption determination to make, i.e., a determination whether state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in passing

the ICA. Citing Medtronic, Inc. v. Lohr, 518 U.S. 470, 495-501(1996), the Court also
proceeded with its construction guided by the well established governing principle that the
powers of the states were not to be superseded in securities law, a field which states traditionally
occupy, unless that was the clear and manifest purpose of Congress.

The Third Circuit panel found no language in the statute or legislative history
that suggested that Congress attempted to preempt such state law claims. 245 F.3d at 225. The
Green Court, in reviewing the legislative history of the ICA, found that Congress recognized
that "the unique structure of mutual funds has made it difficult for the courts to apply traditional
fiduciary standards in considering questions concerning management fees," leading to the
passage of § 36(b) of the ICA (citing S. Rep. No. 91-184 (1970), reprinted in 1970 U.S.Code
Cong. & Ad. News 4897, 4898). 245 F.3d at 224-25. While concluding that the legislative
history demonstrated the intent of Congress to provide a federal remedy to this problem, this
creation of a federal remedy, the Green Court reasoned, did not mean that Congress intended to
eliminate existing state law-based remedies. 245 F.3d at 224-226. Moreover, it could discern
no "language, either in the legislative history of §36(b) or in the statute itself, that suggests that
Congress intended to preempt state law claims for breach of fiduciary duty or deceit when it
enacted §36(b) ." Id. at 225. The Green court further relied upon CTS Corp. v. Dynamics,
Corp., 481 U.S. 69 (1987) (holding securities laws governing corporate takeovers did not
preempt state regulation) for the proposition that state and federal remedies could readily coexist
in the securities field.

The Second Circuit has not been presented with the preemption question
answered by Green. However, the same non-preemption conclusion was readily reached by this

Court, in a similar inquiry involving the interplay of state fraud remedies and the federal securities laws. Zuri-Invest AG v. Natwest Finance Inc., 177 F.Supp.2d 189 (S.D.N.Y.2001), considered whether fraud claims under state law were preempted by the federal securities laws (ICA amendments or NSMIA). Citing the above NSMIA provision and the legislative history, the Court concluded that a "more clear cut statement against preemption would be hard to find." 177 F.Supp.2d at194. The Court also noted the well settled proposition that federal law does not enjoy complete preemptive force in the field of securities. The Court concluded that "the purpose underlying state common law fraud actions--to deter fraudulent practices--is consistent with federal securities law, . . ." 177 F.Supp.2d at 197. See also IDS Bond Inc. v. Gleacher Natwest, Inc., 2002 US Dist. LEXIS 4073 *20, WL 373455, Fed Sec. L. Rep. P. 91750 (D.Minn. March 6, 2002) ("[T]he purpose of the NSMIA is to establish a single, federal scheme for the regulation and qualification of securities. Allowing state fraud claims to proceed does not impede this purpose . . .")).

       This Court, if it does not abstain in this matter, should, for the foregoing reasons, follow the guidance of these courts and reject the claim that the ICA preempts states from performing their traditional role of investigating fraud, including the investigation of, and commencement of state enforcement actions against, persons who may be engaging in fraud with respect to investment advisory fees. Congress has explicitly and officially set forth that state jurisdiction over fraud is not preempted. Plaintiffs seek judicially to achieve a different result than was legislated. That effort to insulate plaintiffs' actions from effective investigation by state authorities must be rejected. The State Attorney General's investigation into possible fraud in the setting of Seligman's advisory fees does not inevitably conflict with Congress'

establishment of SEC oversight of advisory fees under § 36(b) of the ICA. That no court has

found cause to find such a preemptive conflict in the sixty-five years since that ICA's passage

indicates the regard which the present preemption claim should be given.

## CONCLUSION

For the foregoing reasons, defendant Eliot Spitzer, Attorney General of the State

of New York, respectfully requests that the Court (a) abstain under Younger v. Harris and on

that basis, dismiss the complaint; or, in the event the Court does not abstain, (b) hold that the

Investment Company Act of 1940 does not preempt a state attorney general from investigating

possible fraudulent conduct in connection with the setting of advisory fees paid to investment

advisors of mutual funds, and on that basis, dismiss the complaint for failure to state a claim

upon which relief can be granted.

Dated: New York, New York
     October 3, 2005

Respectfully submitted,

ELIOT SPITZER
Attorney General of the
State of New York

By: _____

Louis Willenken (LW-6668)
Assistant Attorney General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8635

James B. Henly
of Counsel